UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CAROL ANN PALLONETTI,

                          Plaintiff,              10 Civ. 4487

          -against-                                OPINION

LIBERTY MUTUAL,

                          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

A P P E A R A N C E S :

          Attorneys for Plaintiff

          THE WOOTEN LEGAL CONSULTING GROUP, PC
          233 Broadway
          New York, NY  10279
          By:  Antoinette M. Wooten, Esq.


          Attorneys for Defendant

          LITTLER MENDELSON, P.C.
          900 Third Avenue
          New York, NY  10022
          By:  David M. Wirtz, Esq.
               Diana R. Nance, Esq.



**Sweet, D.J.**

The defendant Liberty Mutual has moved pursuant to Federal Rule of Civil Procedure 12(c) to dismiss the complaint of plaintiff Carol Ann Pallonetti ("Pallonetti" or the "Plaintiff").  Based upon the facts and conclusions set forth below, the motion is granted.

## I.   Prior Proceedings

On June 7, 2010, Pallonetti filed her complaint against her former employer alleging two claims for age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), negligent infliction of emotional distress, intentional infliction of emotional distress, and negligent hiring, supervision, and retention.

Pallonetti was employed by Liberty Mutual as an Insurance Assistant/Examination-Before-Trial Coordinator in Liberty Mutual's New York Legal Office until August 3, 2007. (Compl. ¶ 1.)  On that date, Liberty Mutual terminated her employment as part of a reduction in force ("RIF").  (Id.)

1

At the time of the RIF, Liberty Mutual gave Pallonetti the option to sign a Severance Agreement and General Release ("Severance Agreement") in exchange for twenty-seven weeks of severance pay. (Answer, Exh. A (hereinafter, "Severance Agreement"), ¶¶ 1, 12). Paragraph 5 of that Agreement states, in part:

> Employee hereby knowingly and voluntarily releases and forever discharges Liberty Mutual . . . from any and all claims, known and unknown, that Employee . . . has or may have as of the date of execution of this Agreement, including, but not limited to, any alleged violation of . . . the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq.; . . . [a]ny claims arising out of Employee's employment, including without limitation, claims based upon . . . age . . . discrimination; . . . [and a]ny . . . [claims based upon] express or implied public policy, contract, tort, or common law . . . .

Pallonetti has alleged that she was discriminated against on the basis of age in that she "was unlawfully and improperly discharged from her position of Insurance Assistant/Examination Before Trial Coordinator . . . without just cause" and that, "on or about July 18, 2007," "was falsely told that her position was being phased out [and] that there was no other position available to her." (Compl. ¶¶ 1, 11, 18.) These claims are alleged to have arisen when she learned of the decision to terminate her employment on July 18, 2007 and that

2

"Defendant, its servants, agents and/or employees failed to prevent the Plaintiff from being subjected to age discrimination and intentional infliction of emotional distress while [she] was lawfully present and performing work relative to her employment . . . and within the scope of her employment." (Id. at ¶ 14.) She further claims that she was "consistently subject to negligent infliction of emotional distress by being subjected to an unlawful and improper discharge; the denial of her right to use her seniority to remain employed by the Defendant; [and because she was] coerced into signing an unfair severance and release agreement in order to collect her severance pay." (Id. at ¶ 18.)  Finally, she claims that Liberty Mutual was negligent in its "hiring, improper monitoring, supervision, and retention" of two Human Resources employees, because they failed to "protect the Plaintiff from being subjected to age discrimination and negligent infliction of emotional distress at her place of employment." (Id. at ¶¶ 23-27.)

Pallonetti also alleges that she was the victim of age discrimination when she was "denied the opportunity to apply for a position that was listed on the Defendant's website after her unlawful discharge." (Id. at ¶ 18.)

3

The instant motion was marked fully submitted on
October 27, 2010.

## II.  The Rule 12(c) Standard

A court presented with a motion for judgment on the
pleadings pursuant to Fed. R. Civ. P. 12(c) must review the
motion using the same standard that is applicable to motions
brought pursuant to Fed. R. Civ. P. 12(b)(6); i.e., the court
must assume the truthfulness of the material facts alleged in
the complaint.  Lambertson v. Kerry Ingredients, Inc., 50 F.
Supp. 2d 163, 166-67 (E.D.N.Y. 1999).

The purpose of Rule 12(c) motions is to test the legal
sufficiency of a plaintiff's complaint, and the court's inquiry
is limited to whether "plaintiff plead[s] sufficient facts 'to
state a claim for relief that is plausible on its face.'"
Clifford v. HBO, Inc., No. 08 Civ 3357, 2009 U.S. Dist. LEXIS
43352, at *4-5 (E.D.N.Y. May 18, 2009) (quoting Bell Atlantic
Corp. v. Twombly, 550 U.S. 544 (2007)).  To withstand a Rule
12(c) motion, the complaint must state more than a "formulaic
recitation of the elements of a cause of action"; rather,
"factual allegations must be enough to raise a right to relief

4

above the speculative level." Id. (quoting Twombly, 550 U.S. 544).

## III.  The Claims Preceding the Release Are Dismissed

### a.    The Severance Agreement Meets the Statutory Requirements for a Knowing and Voluntary Release

In Oubre v. Energy Operations, 522 U.S. 422, 426-27 (1998), the Supreme Court stated that the ADEA has its own method of assessing the effect of ADEA waivers, separate and apart from contract law.  Specifically, the ADEA, through its amendment by the Older Workers Benefit Protection Act ("OWBPA"), "creates a series of prerequisites for knowing and voluntary waivers and imposes affirmative duties of disclosure and waiting periods."  Id.; see also Clifford, 2009 U.S. Dist. LEXIS 43352, at *12-15; Bradley v. TIAA-CREF, No. 04 Civ. 2434, 2005 U.S. Dist. LEXIS 24455, at *3 (S.D.N.Y. Oct. 20, 2005).

Pursuant to the OWBPA, a waiver or release of ADEA rights and claims is knowing and voluntary if it: (1) "is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual"; (2) "specifically refers to rights or claims

5

arising" under the ADEA; (3) does not waive claims arising after the date of the waiver; (4) waives claims "only in exchange for consideration in addition to anything of value to which the employee is already entitled"; (5) advises, in writing, that the releasor should consult with an attorney prior to executing the agreement; (6) provides a period of twenty-one days for the employee to consider the agreement or forty-five days if the waiver is in connection with an exit incentive or other employment termination program offered to a group or class; (7) provides for at least a seven-day revocation period; and (8) if the agreement is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, informs the individual in writing as to: (a) "any class, unit or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program," and (b) "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." See 29 U.S.C. § 626(f)(1).

First, the Severance Agreement is in writing, and it is written in plain, easily understood language. (See Severance

Agreement.)  At page 4, it states that:  "EMPLOYEE'S SIGNATURE
BELOW CONSTITUTES EMPLOYEE'S ACKNOWLEDGMENT THAT EMPLOYEE ...
HAS READ THE AGREEMENT, THAT EMPLOYEE FULLY UNDERSTANDS ITS
TERMS, AND THAT EMPLOYEE KNOWINGLY AND VOLUNTARILY AGREES TO BE
BOUND BY IT."  Pallonetti signed and dated the Severance
Agreement right under the words "UNDERSTOOD, ACCEPTED AND
AGREED."  (Severance Agreement at 4.)  Thus, the first OWBPA
requirement is met. See, e.g., Farrell v. Title Assocs., Inc.,
No. 03 Civ. 4608, 2004 U.S. Dist. LEXIS 2508, at *10 (S.D.N.Y.
Feb. 19, 2004) (finding the first requirement of the OWBPA was
satisfied where the document employed a minimum of legal
terminology and the employee acknowledged, through her signature
on it, that she had "carefully read and fully understood all of
the provisions" of the release).

Second, Paragraph 5 of the Severance Agreement,
entitled "General Release of Claims," specifically identifies
"The Age Discrimination in Employment Act, as amended, 29 U.S.C.
§ 621 et seq."

Third, the Severance Agreement does not release claims
arising out of occurrences that post-date its execution.  In
fact, the Agreement specifically states that the "Employee

7

hereby knowingly and voluntarily releases and forever discharges Liberty Mutual [and additional, related parties] of and from any and all claims, known and unknown, that the Employee [and related parties] has or may have as of the date of the execution of this Agreement...."  (Severance Agreement, § 5.)

Fourth, Pallonetti acknowledged that the twenty-seven weeks of severance pay at her current rate of weekly pay is something to which she was not otherwise entitled (see Severance Agreement, ¶¶ 2-3), and that Paragraph 2 of the Severance Agreement had no effect on benefits to which she was "otherwise eligible pursuant to the Liberty Mutual Thrift Incentive or Retirement Benefit Plans, or under any claim for workers' compensation benefits."  (Severance Agreement, ¶ 2.) Additionally, Pallonetti acknowledged that she had "been paid and/or [had] received all compensation, wages, bonuses, commissions and/or benefits which were due and payable to [her] as of the date of [her] termination, and that no other compensation, wages, bonuses commissions and/or benefits" were due to her "except as provided in this Agreement...." (Severance Agreement, ¶ 7.)  Finally, Page 4 of her Severance Agreement reiterates that:  "EMPLOYEE UNDERSTANDS THAT EMPLOYEE'S RIGHT TO RECEIVE THE SEVERANCE BENEFITS REFERENCED IN

8

THIS AGREEMENT IS SUBJECT TO EMPLOYEE'S COMPLIANCE WITH THE TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT AND THAT EMPLOYEE WOULD NOT RECEIVE SUCH BENEFITS BUT FOR EMPLOYEE'S EXECUTION OF THIS SEVERANCE AGREEMENT AND GENERAL RELEASE." (Severance Agreement, at 4).  Under the terms of the Severance Agreement, Pallonetti had no entitlement to the twenty-seven weeks of severance pay unless and until she executed the Severance Agreement.  See, e.g., Farrell, 2004 U.S. Dist. LEXIS 2508, at *10-11 (finding the fourth requirement of the OWBPA to be met where plaintiff received a severance payment in consideration for signing the release and "expressly acknowledged 'that ABSENT THIS AGREEMENT, [she] would not otherwise be entitled to the money specified.'").  See also Reid v. IBM Corp., No. 95 Civ. 1755, 1997 U.S. Dist. LEXIS 8905, at *13-14 (S.D.N.Y. June 24, 1997) (same); Clifford, 2009 U.S. Dist. LEXIS 43352, at *17-19 (same).

Fifth, Pallonetti acknowledged at Paragraphs 1 and 11 of her Complaint that she was "told to consult an attorney before signing the agreement."  Although she complains that Liberty Mutual did not offer to pay for her lawyer's review, the OWBPA contains no such requirement.  It requires only that the employer "advise, in writing, that the releasor consult with an

attorney" (29 U.S.C. § 626(f)(1)(E)), which Liberty Mutual did. (See Severance Agreement, at 4.)

Sixth, because Liberty Mutual terminated Pallonetti's employment as part of a RIF, she was given forty-five days to consider whether to sign the Severance Agreement.  (See Severance Agreement, at 4.)  She admits that this is true in her Complaint at Paragraph 1.

Seventh, Liberty Mutual told Pallonetti that she had the right to revoke the Severance Agreement "at any time during the seven (7) calendar day period following the date on which [she] first signs the Agreement."  (Severance Agreement, ¶ 13.) Paragraph 13 of the Severance Agreement not only informed Pallonetti of her right to revoke the Severance Agreement, but it detailed precisely how to do so.  (Severance Agreement, ¶ 13.)

Eighth and finally, because Liberty Mutual terminated Pallonetti's employment as part of a RIF affecting multiple employees, it attached the "Older Workers Benefit Protection Act Disclosure" to the Severance Agreement.  (See Answer, Exh. A, unnumbered pp. 5-6.)  The Disclosure: (a) identified the

10

decisional unit as the New York office and the "factors considered in making selection decisions," and (b) set forth the job titles and ages of the individuals in the decisional unit, indicating those individuals who were selected for the RIF and those who were not. (Id.)  Pallonetti's initials in the lower right hand corner of both pages of the Disclosure evidence that she received and viewed it along with the Severance Agreement. (Id.)  The Severance Agreement met the OWBPA requirements and was enforceable as to any ADEA claims that accrued prior to the date of her execution of the Severance Agreement, and any other claim that she released pursuant to it.  See, e.g., Clifford, 2009 U.S. Dist. LEXIS 43352, at *24-25, *31-32 (enforcing agreement and release that complied with all requirements of the OWBPA against ADEA and non-ADEA claims).

### b. The Severance Agreement Was Not Unconscionable and Plaintiff Was Not Under Economic Duress

Pallonetti has also claimed that the Severance Agreement was "unconscionable" and alleges facts seeking to state a claim for economic duress.  She has alleged that (1) she would have had to pay any attorney with whom she consulted about the Severance Agreement before signing it, and (2) she "could only receive her severance pay if she signed" the Severance

Agreement.  (See Compl., ¶¶ 11-12; Pl. Mem. Opp. at 9.)  Neither

of these facts rendered the Severance Agreement non-compliant

with the OWBPA, nor do they render the contract unconscionable

under New York law.  The Severance Agreement is not, by virtue

of these or any other of its terms, "so grossly unreasonable as

to be [unenforceable according to its literal terms] because of

an absence of meaningful choice on the part of one of the

parties ['procedural unconscionability'] together with contract

terms which are unreasonably favorable to the other party

['substantive unconscionability]."  Lawrence v. Miller, 11

N.Y.3d 588, 595 (1998) (quoting King v. Fox, 7 N.Y.3d 181, 191

(2006)); see also Nayal v. HIP Network Servs. IPA, Inc., 620 F.

Supp. 2d 566, 571 (S.D.N.Y. 2009) (citations and internal

quotations omitted).


          To determine whether a party lacked "meaningful

choice," courts look for evidence of high pressure or deceptive

tactics, as well as disparity in bargaining power.  See, e.g.,

Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 382

(S.D.N.Y. 2002).  Pallonetti has offered no authority stating

that she had the right to consult with an attorney before

signing the Agreement, and that giving her 45 days to do so but

not offering to pay for that lawyer is pressure or deception and

12

is the kind of conduct that would deprive her of the ability to make a "meaningful choice."   Furthermore, Pallonetti has not established that the Severance Agreement's terms are so unreasonable as to be unenforceable.

Paragraph 18 of Pallonetti's complaint alleges that she was "coerced into signing an unfair severance and release agreement in order to collect her severance pay," which suggests an intention to state a claim that the release she signed should be invalidated because she was under economic duress when she signed it.   The predicate is that Liberty Mutual took advantage of her economic need for the severance payment.

Under New York law, a "party seeking to avoid a contract because of economic duress shoulders a heavy burden." Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 527 (S.D.N.Y. 2001) (citations omitted).   Economic duress consists of: (1) a threat, (2) which is unlawfully made, and (3) causes involuntary acceptance of contract terms, (4) because the circumstances provide no other alternative.   See, e.g., Farrell, 2004 U.S. Dist. LEXIS 2508, at *15-16 (citations omitted).

First, the "threat" in this case - that there would be no severance pay unless Pallonetti signed the Severance Agreement - was not "unlawfully made." Nasik, 165 F. Supp. 2d at 527 (holding that a plaintiff's difficult economic circumstances do not render a severance agreement a threat, and that a lack of a wrongful threat is fatal to an economic duress claim). Second, she had an alternative refuse to sign the Agreement and pursue her legal remedies. "Courts have found this option - turning down the additional severance and pursuing legal claims - to be a reasonable alternative, even if a hefty financial incentive is offered for signing the Release." Reid, 1997 U.S. Dist. LEXIS 8905, at *22 (citations omitted).

Thus, there is no allegation that Liberty Mutual made any unlawful threat regarding the Severance Agreement, nor that she had no practical alternative to signing the Severance Agreement. In the absence of such allegations, even if it was her financial situation that caused her to decide to accept the severance pay Liberty Mutual offered, she has no claim that the release in her Severance Agreement is void on the basis of economic duress. See Farrell, 2004 U.S. Dist. LEXIS 2508, at *16-18 (finding plaintiff's claim that she signed an OWBPA-compliant release under duress because she needed the severance

14

payment to pay rent and buy groceries to be without merit when
she did not allege an improper threat, did not show lack of a
practical alternative, and when she failed to revoke the
release).  See also Bachiller v. Turn on Prods., Inc., No 00
Civ. 8701, 2003 U.S. Dist. LEXIS 6164, at *11-12 (S.D.N.Y. Apr.
11, 2003) (plaintiffs claim of economic duress insufficient to
invalidate OWBPA-compliant release when plaintiff did not show
lack of practical alternative and failed to timely revoke the
release); Reid, 1997 U.S. Dist. LEXIS 8905, at *21-23 (no
economic duress claim where plaintiff did not demonstrate threat
and "could have rejected the Release and pursued his legal
remedies.")

        In addition, any claim that the Severance Agreement is
voidable in 2010 due to unconscionability or economic duress
Pallonetti suffered from in 2007 must fail because she did not
act at all, let alone "promptly," to revoke the Severance
Agreement, or to return the consideration she received because
she signed the Agreement.  See Farrell, 2004 U.S. Dist. LEXIS
2508, at *17-18; Bachiller, 2003 U.S. Dist. LEXIS 6164, at *11-
12; Nasik, 165 F. Supp. 2d at 527; Reid, 1997 U.S. Dist. LEXIS
8905, at *30-34, 43-45.  Under general contract principles,
"when a party ratifies avoidable contract, [s]he in effect makes

15

a new promise or creates a new legal duty to perform." Id. at
*31.  The OWBPA does not prevent ratification of a waiver of
ADEA claims when the release in question satisfies the statute's
minimum requirements for a knowing and voluntary release.  Id.
at *45.  Pallonetti's ratification of the Agreement - i.e., her
failure to revoke it and to return the twenty-seven weeks of pay
she received as severance - renders the Agreement valid and
enforceable against her.  Id. at *30-34, 43-45; Farrell, 2004
U.S. Dist. LEXIS 2508, at *17-18.  Pursuant to her Severance
Agreement, Pallonetti released "Liberty Mutual ... from any and
all claims, known and unknown, that Employee ... has or may have
as of the date of execution of this Agreement, including, but
not limited to, any alleged violation of ... the Age
Discrimination in Employment Act ... [and] any ... tort ... "
(Severance Agreement, ¶ 5.)

### c.   The Severance Agreement was Knowing and Voluntary Under the "Totality of the Circumstances" Test

At pages 6-7 of her Memorandum in Opposition,
Pallonetti contends that she did not execute her Agreement
"knowingly and voluntarily" and seeks to have the validity of
her Agreement analyzed under the "totality of the circumstances"
test.  This test is appropriate for analyzing the release of

16

discrimination claims under statutes "other than" the ADEA, such
as Title VII, which was at issue in the case she cited, Nicholas
v. Nynex, Inc., 929 F. Supp. 727 (S.D.N.Y. 1996).  Releases of
ADEA rights and claims, however, are to be analyzed under the
OWBPA's "knowing and voluntary" standard.  See Oubre, 522 U.S.
at 426-27; Clifford, 2009 U.S. Dist. LEXIS 43352, at *12-15.
However, as set forth above, the OWBPA requirements have all
been met here.  However, even under the "totality of the
circumstances," Pallonetti's allegations are insufficient.


          The "circumstances" to be considered are set forth in
Bachiller, 2003 U.S. Dist. LEXIS 6164, at *8-9, as follows: (1)
the plaintiff's education and experience, (2) "the amount of
time she had to consider the agreement before signing it," (3)
the role she played in deciding its terms, (4) whether she
consulted a lawyer, and (5) whether she received consideration
that exceeded what she was otherwise entitled to.  Id. (citation
omitted).  A defendant need not satisfy all of these factors for
the "totality of the circumstances" to support the
enforceability of the release.  Id. at *9.  At pages 7-9 of her
Memorandum in Opposition, Pallonetti offers her Bachiller
"circumstances."  Taking each circumstance in turn, the Court
finds the following:

17

(1) Pallonetti fails to establish that she "did not have the requisite knowledge or business savvy" to enter into the Agreement, as she is a trained paralegal and has at least 26 years of experience as a Senior Insurance Assistant Examination Before Trial Clerk. (Pl. Mem. Opp. 7-8.). See, e.g., Bachiller, 2003 U.S. Dist. LEXIS 6164, at *9 (high school equivalency degree and experience as an accounts clerk sufficient); Laramee v. The Jewish Guild for the Blind, 72 F. Supp. 2d 357, 360 (S.D.N.Y. 1999) (high school education and employment in a secretarial position sufficient).

(2) Forty-five days was sufficient time for a trained paralegal to read and consider the terms of the Agreement.

(3) There are no allegations about the role she played in the negotiations over the terms of her Agreement.  However, the absence of negotiations is not enough to render a contract unenforceable. Laramee, 72 F. Supp. 2d at 360 (citations omitted).

(4) Pallonetti was offered the opportunity to consult with an attorney and was advised to do so (see Severance

18

Agreement at 4), and this has been held to be sufficient under the fourth Bachiller circumstance.  See Parker v. Chrysler Corp., 929 F. Supp. 162, 166-67 (S.D.N.Y. 1996) (plaintiff's release upheld where he was advised orally and in writing to consult with an attorney but did not do so).  Further, she acknowledged in the Agreement itself that: "EMPLOYEE HAS READ THE AGREEMENT, THAT EMPLOYEE FULLY UNDERSTANDS ITS TERMS, AND THAT EMPLOYEE KNOWINGLY AND VOLUNTARILY AGREES TO BE BOUND BY IT" (Severance Agreement, at 4), which should also be considered in determining the "totality of the circumstances." Laramee, 72 F. Supp. 2d at 361 ("she acknowledged that she had a 'full understanding of its terms'").

(5) Pallonetti alleged that the consideration she received "did not exceed the employee benefits to which she was entitled."  However, there is no legitimate issue of fact on this issue because she has agreed in writing that she received more than she was entitled to.  (Severance Agreement, at ¶ 3.)

In addition to the five Bachiller "circumstances," Pallonetti contends the following:

19

(6) The consideration she received did not adequately "reflect her time and service" to Liberty Mutual. (Pl. Mem. Opp. at 8.) However, there is nothing inherently unreasonable about offering an employee a week of severance pay for every year of service. See, e.g., Farrell, 2004 U.S. Dist. LEXIS 2508, at *15 (severance agreement providing two weeks pay after seven years of employment upheld after consideration of "totality of the circumstances"). Additionally, this "circumstance" is inconsistent with Pallonetti's acknowledgment that she received consideration beyond that to which she was otherwise entitled. (Severance Agreement, at ¶ 3).

(7) Liberty Mutual acted in "bad faith" with "unclean hands" and a "breach of loyalty." (Pl. Mem. Opp. at 8-10.) These allegations are conclusory and without supporting factual assertions.

(8) She could not afford a lawyer, and Liberty Mutual did not give her the time to "acquire the finances" to get one, or pay for one. (Pl. Mem. Opp. at 9.) If advising an individual to get a lawyer and giving her time to do so is sufficient, then a fortiori these allegations are insufficient. Pallonetti has not identified a requirement in OWBPA or

20

elsewhere that requires an employer to pay for an employee's lawyer or wait for her to obtain one.

In sum, Pallonetti's Agreement meets all of OWBPA's requirements for a "knowing and voluntary" release; the "totality of the circumstances" do not invalidate that Agreement; the Agreement was not unconscionable; and, she was not subject to the requisite economic duress as a matter of law.

### d.    Plaintiff Fails to Establish that She was Fraudulently Induced to Execute the Severance Agreement

Plaintiff contends at page 4 of her Opposition Memorandum that the Severance Agreement is voidable because she was fraudulently induced into signing it.  However, Pallonetti does not plead fraud with the particularity required by Fed. R. Civ. P. 9(b), fraudulent inducement is not one of her causes of action, and the terms "fraud" or "fraudulent inducement" do not appear in her complaint.  In addition, her complaint does not contain factual allegations sufficient to state a plausible fraudulent inducement claim.

"'The requisite 'strong inference' of fraud may be established either by: (a) alleging facts to show that

21

defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting Shields v. City Trust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotations omitted)).  To avoid speculative and conclusory claims and thereby comply with Rule 9(b), the Second Circuit has held that "'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Lerner, 459 F.3d at 290 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Pallonetti has alleged that she "was falsely told that her position was being phased out; that there was no other position available to her; that she had to sign [the Agreement] in order to receive severance pay ... ; that [she] could consult an attorney before she signed the agreement but the attorney's fees had to be paid by the Plaintiff without just cause." (Compl. ¶ 11.)  She does not state who told her these things, what words were used, where or when the allegedly fraudulent

22

statements were made, or even how, exactly, the statements were false.

To state a fraudulent inducement claim, a plaintiff must demonstrate that: (1) the defendant made a material misrepresentation, (2) that it knew to be false, (3) such misrepresentations was made for the purpose of inducing the claimant to rely; (4) her reliance was justifiable, and (5) her reliance resulted in damages. See Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P., 669 F. Supp. 2d 430, 444 (S.D.N.Y. 2009) (citing Braddock v. Braddock, 60 A.D.3d 84, 86 (1st Dep't 2009)).

Plaintiff's allegations of false statements lack the requisite specificity, and the language of the Severance Agreement makes it difficult for her to establish the fourth element of a fraudulent inducement claim - justifiable reliance. Paragraph 11 of the Severance Agreement states, in part, that "This Agreement sets forth the entire agreement between Employee and Liberty Mutual," and that Pallonetti "acknowledges that [she] has not relied on any representations, promises, or agreements of any kind made to [her] in connection with [her] decision to sign this Agreement."  This integration clause

23

forecloses her claim that she "justifiably relied" upon a representation that does not appear within the four corners of the Agreement. See, e.g., Nasik, 165 F. Supp. 2d at 534-35 (finding no justifiable reliance where a disclaimer and merger provision refuted such reliance).

### e. The Severance Agreement Releases Plaintiff's Claims Related to Her Termination

As noted above, Pallonetti's ADEA claim arose when she was notified of the decision to terminate her employment. See, e.g., Clifford, 2009 U.S. Dist. LEXIS 43352, at *25-26 ("plaintiff's ADEA claim arose when he was notified of the decision to terminate his employment, which was prior to his execution of the Agreement and Release, not when he discovered that the reason behind his termination may have been discriminatory"); see also Affrunti v. Long Island Univ., 136 Fed. Appx. 402, 403 (2d Cir. 2005) ("The time period in which to file a charge with the EEOC begins on the date the employee has definite notice of the termination, not the date of actual discharge.") For Pallonetti, this notification came on or about July 18, 2007, before she signed the Severance Agreement on August 6, 2007. (See Compl. ¶ 18.) Pallonetti thereby has

24

released Liberty Mutual from any claim that her termination came because of her age.

## IV.  The Allegations Of Failure to Hire Due to Age Discrimination Are Dismissed

Plaintiff's valid release of her termination-related claims leaves only her claim for age discriminatory failure to rehire.  This claim fails as a matter of law.

The ADEA makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual ... because of such individual's age."  29 U.S.C. § 623(a)(1).  In order to state a claim for discriminatory failure to hire or rehire under the ADEA, a plaintiff must allege that: (1) she falls within the protected group, (2) she applied for a position for which she was qualified, (3) she was subject to an adverse employment decision, and (4) that the adverse employment decision was made under circumstances suggesting it was due to age discriminatory animus.  See, e.g., Ajayi v. Dep't. of Homeless Services, No. 08 Civ. 3649, 2009 U.S. Dist. LEXIS 51124, at *39 (S.D.N.Y. June 18, 2009) (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001)); Gross v. FBL Financial Services, 129 S. Ct. 2343, 2351 (2009) (confirming that in ADEA cases,

"the plaintiff retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action").

Pallonetti has alleged that Liberty Mutual sought applicants for her position after she was RIF'd, and that she learned from the company's website that it was doing so. (Compl. ¶ 18).  Pallonetti claims that, "on or about August 20th, 2007," she "was denied the opportunity to apply for a position that was listed on the Defendant's website after her unlawful discharge," and that Liberty Mutual "denied [her] the opportunity to apply for a position that was comparable to [her] former position with Defendant."  (Compl. ¶ 18.)  However, she does not allege that she applied for this comparable position or how Liberty Mutual "denied [her] the opportunity" to do so, nor does she allege that she was qualified for the position that was alleged to have been posted on Liberty Mutual's website, since she contends that the position was "comparable" but not identical to the one that she had held prior to the RIF. Therefore, she has failed to state a claim as a matter of law. See Affrunti, 136 Fed. Appx. at 404 (affirming district court's dismissal of plaintiffs ADEA claims as time barred because failure to rehire claim did not constitute continuing violation,

26

and because plaintiff did not provide evidence that she actually
applied for any positions subsequent to her termination).  As a
consequence of these deficiencies, and her failure to allege
that age was the "but-for" reason for Liberty Mutual's alleged
failure to hire her (see Gross, 129 S. Ct. at 2351),
Pallonetti's allegations are also insufficient to state a
"plausible" age-discriminatory failure to rehire claim within
the meaning of Twombly, 550 U.S. 544, and Ashcroft v. Iqbal, 129
S.Ct. 1937 (2009).

In opposition, Pallonetti states that she "searched
for employment for six months, during which time she found a
posting for employment at Liberty Mutual .... [W]hen she
contacted Human Resources to determine if she was permitted to
apply for the job, she received no reply."  (Pl. Mem. Opp. at
5.)  This fails to constitute a denial of an opportunity to
apply.

## V.   Plaintiff Fails to State a Claim for Emotional Distress

Pallonetti has also alleged that she suffered
negligent and intentional infliction of emotional distress
because "Defendant, its servants, agents and/or employees failed
to prevent the Plaintiff from being subjected to age

27

discrimination and intentional infliction of emotional distress while [she] was lawfully present and performing work relative to her employment ... and in the scope of her employment," and because she was "subjected to an unlawful and improper discharge," denied the "right to use her seniority to remain employed by the Defendant," "denied the opportunity to apply for a position that was listed on the Defendant's web site after her unlawful discharge," "coerced into signing an unfair release and severance agreement in order to collect her severance pay," and "suffered serious economic loss and inconvenience." (Compl. ¶¶ 14, 18, 20). Except for the claim that Pallonetti was denied the opportunity to apply for a position following her termination, each of these alleged events occurred prior to, concurrent with, or as a direct consequence of the termination of her employment and was released pursuant to the terms of her Severance Agreement. Independently of this basis for dismissal, Pallonetti has failed to state a claim for emotional distress.

To state an intentional infliction of emotional distress claim, a plaintiff must set forth facts showing: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct

28

and the injury; and (4) severe emotional distress." Conboy v.
AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001) (quoting Stuto v.
Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)).  A negligent
infliction of emotional distress claim requires the same
"extreme and outrageous" conduct, and it also requires a showing
that the defendant's conduct "unreasonably endangered [the
plaintiff's] physical safety or, as exceptions to this rule,
that untruthful information regarding death was transmitted or
that a corpse was negligently mishandled."  Hart v. Child's
Nursing Home Co., Inc., 298 A.D.2d 721, 723 (3rd Dep't 2002)
(quoting Dobisky v. Rand, 248 A.D.2d 903, 905 (3rd Dep't 1998)).


        It is the role of the court to determine in the first
instance whether the conduct alleged satisfies the high standard
of extreme outrageousness necessary to state a claim.  Walker v.
New York City Transit Auth., No. 99 Civ. 3337, 2001 U.S. Dist.
LEXIS 14569, at *42 (S.D.N.Y. Sept. 19, 2001) ("The Court is to
determine in the first instance whether the conduct in question
may be regarded as extreme and outrageous as to permit
recovery.").  The conduct must be so extreme and outrageous that
it "transcends the bounds of decency as to be regarded as
atrocious and intolerable in a civilized society."  Kaiser v.

29

Van Houten, 12 A.D.3d 1012, 1015 (3rd Dep't 2004) (quoting

Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143 (1985)).


      In employment cases, the courts are "particularly

cautious" in allowing claims for intentional infliction of

emotional distress to proceed past the pleading stage.  Benjamin

v. New York City Dep't of Health, No. 99 Civ. 12345, 2002 U.S.

Dist. LEXIS 5446, at *28 (S.D.N.Y. Mar. 29, 2002), vacated in

part on other grounds by 144 Fed. Appx. 140 (2d Cir. 2005).

This view follows the decision of the New York State Court of

Appeals in Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303

(1983), which established that a plaintiff should not be allowed

to "subvert the traditional at-will contract rule by casting its

cause of action in terms of a tort of intentional infliction of

emotional distress."  See also Fama v. American Int'l Group,

Inc., 306 A.D.2d 310, 311-12 (2nd Dep't 2003) ("terminating the

plaintiff's employment may not form the basis of an intentional

infliction of emotional distress cause of action in

circumvention of the at-will employment rule in New York");

Navarro v. Federal Paper Board Co., Inc., 185 A.D.2d 590, 594

(3rd Dep't 1992) (plaintiff, who was arrested in front of his

co-workers, did not allege sufficiently egregious conduct to

support a claim of intentional infliction of emotional

                           30

distress).  Where courts have found complaints sufficient to
state a claim for intentional or negligent infliction of
emotional distress in the employment context, "the claims have
been accompanied by allegations of sex discrimination and 'more
significant battery.'"  Benjamin, 2002 U.S. Dist. LEXIS 5446, at
*28; see also Curto v. Medical World Commc'ns, Inc., 388 F.
Supp. 2d 101, 112 (E.D.N.Y. 2005) ("The rare instances where the
New York courts have found the complaint sufficient to state an
[intentional infliction of emotional distress] claim in the
employment context generally involve allegations of more
significant battery, or improper physical contact.") (quoting
Gilani v. National Ass'n of Secs. Dealers, Inc., No. 96 Civ.
8070, 1997 WL 473383, at *14 (S.D.N.Y. Aug. 19, 1997)).  Thus,
courts routinely dismiss claims for intentional infliction of
emotional distress where the plaintiff's allegations regarding
his/her treatment by supervisors or other employees do not rise
to the "outrageous" level required to state a claim.  See, e.g.,
James v. Federal Reserve Bank of New York, No. 01 Civ. 1106,
2005 U.S. Dist. LEXIS 43493, at *32 (E.D.N.Y. Aug. 8, 2005)
(alleged threats, retaliation, and discrimination did not meet
the strict standard of outrageousness required to state a claim
for intentional infliction of emotional distress); Benjamin,
2002 U.S. Dist. LEXIS 5446, at *29 (allegations of disparate

31

treatment, humiliation and insults did not meet the threshold
level required to sustain a claim for intentional infliction of
emotional distress); Castro v. New York City Bd. of Educ., No.
96 Civ. 6314, 1998 U.S. Dist. LEXIS 2863, at *27-31 (S.D.N.Y.
Mar. 11, 1998) (plaintiff's claim that she was subjected to a
work environment where she was "humiliated, degraded, and
ultimately fired and forced out of her ... employment by police
officers" did not meet the standards for pleading intentional
infliction of emotional distress).

As stated above, Pallonetti has alleged that her
employment was wrongfully terminated based on her age and false
statements concerning her termination; that she was "coerced"
into signing the Severance Agreement because she needed the
severance pay; that Defendant prevented her from applying for a
position after terminating her; and that she suffered "serious
economic loss and inconvenience." (Compl. ¶¶ 1, 4, 9-12, 14,
18, 20). These claims do not meet the stringent standard for
establishing intentional or negligent infliction of emotional
distress claims. See Curto, 388 F. Supp.2d at 112; James, 2005
U.S. Dist. LEXIS 43493, at *32; Benjamin, 2002 U.S. Dist. LEXIS
5446, at *28-29; Castro, 1998 U.S. Dist. LEXIS 2863, at *28-30;
Hart, 298 A.D.2d at 723.

32

## VI.   Plaintiff's Claim for Negligent Hiring, Supervision, and Retention is Dismissed for Failure to State A Claim

Finally, Pallonetti has complained about the "hiring, improper monitoring, supervision, and retention of Robin Reyes and Dawn Gilbert" - two individuals employed in Liberty Mutual's Human Resources Department, and that these two individuals failed to "protect the Plaintiff from being subjected to age discrimination and negligent infliction of emotional distress at her place of employment." (Compl. ¶¶ 4, 24, 25.)  As pled, these tort claims arose before Pallonetti signed the Severance Agreement, and they are barred by the Severance Agreement's release.  Independently of this release, Plaintiff has failed to allege sufficient facts to state this claim.

To state a claim for negligent hiring, supervision, and retention under New York law, a plaintiff must allege "in addition to the standard elements of negligence," that "(1) the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and, (3) that the tort was committed on the employer's premises or with the employer's

33

chattels." Bouchard v. New York Archdiocese, 719 F. Supp. 2d

255, 261 (S.D.N.Y. 2010) (quoting Ehrens v. Lutheran Church, 385

F.3d 232, 235 (2d Cir. 2004)) (internal quotations omitted).


        Pallonetti's complaint fails to allege facts

establishing that she was harmed by Defendant's employees'

conduct.  She alleges that Liberty Mutual had "knowledge of [Ms.

Reyes and Ms. Gilbert] being unsuitable, incompetent and unfit

to act and serve ... as employees of an insurance company

serving the public" (Compl. ¶ 25), but she does not set forth

any facts as to how Ms. Reyes or Ms. Gilbert failed to protect

her from discrimination or caused her to suffer emotional

injuries and damages, how Liberty Mutual failed to properly

supervise them, or how Liberty Mutual would have known that they

had a propensity to cause the alleged harm.  Accordingly,

Plaintiff fails to state a plausible claim for negligent hiring,

supervision, and/or retention, and Defendant is entitled to

judgment as a matter of law.

34

**Conclusion**

       For the reasons set forth above, Pallonetti's claims
are barred by the Agreement and are legally insufficient.   The
motion of Liberty Mutual is granted and the complaint dismissed
with prejudice.


**New York, NY**
**February** // **, 2011**

                                           **ROBERT W. SWEET**
                                              **U.S.D.J.**

35